**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLP**
BETSY C. MANIFOLD (182450)
ALEX J. TRAMONTANO (276666)
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
tramontano@whafh.com

*Attorneys for Plaintiff*
[*Additional Counsel Listed Below*]

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL WARNER, Derivatively on Behalf of ILLUMINA, INC.<br><br>Plaintiff,<br><br>v.<br><br>FRANCIS A. DESOUZA, SAM. A SAMAD, FRANCES ARNOLD, CAROLINE DORSA, ROBERT S. EPSTEIN, SCOTT GOTTLIEB, GARY S. GUTHART, PHILIP SCHILLER, SUE SIEGEL, ANDREW TENO, SCOTT B. ULLEM and JOHN THOMPSON,<br><br>Defendants,<br><br>and,<br><br>ILLUMINA, INC.<br><br>Nominal Defendant. | CASE NO.: **'24CV0464 BAS BLM**<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPAINT**<br><br>**JURY TIAL DEMANDED** |

Plaintiff Michael Warner ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Illumina, Inc. ("Illumina" or the "Company"),

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.   This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy the Individual Defendants' (defined below) violations of state and federal law that have occurred from September 21, 2020 through the present (the "Relevant Period") and have caused substantial harm to the Company through, *inter alia*, regulatory investigations, large fines, and litigation.

2.   Based in San Diego, California, the Company develops, manufactures, and markets integrated systems for large scale analysis of genetic variation and biological functions.

3.   In 2015, the Company created a subsidiary called GRAIL, Inc. ("GRAIL"). GRAIL's goal was to create a non-invasive blood test that could screen asymptomatic patients for several types of cancer. In 2017, the Company spun GRAIL off as a standalone, privately held company.

4.   On September 21, 2020, the Company announced its plan to re-acquire GRAIL for $8 billion.

5.   The Individual Defendants repeatedly justified the GRAIL acquisition to shareholders, including by stating the acquisition "will result in the savings of tens

of thousands of lives . . . simply because we can accelerate the business" and that the acquisition was "creating long-term shareholder value." As a result of these material misrepresentations and omissions, shares of the Company's common stock traded at artificially inflated prices.

6. The truth began to emerge on March 30, 2021, when the U.S. Federal Trade Commission (the "FTC") sued in U.S. Federal Court to block the Company's acquisition of GRAIL. In response, the Company published a press release stating it "disagrees with, and will oppose, the [FTC]'s challenge to its previously announced acquisition of GRAIL." On this news, the price of the Company common stock declined nearly 6.6%, from a closing price of $395.00 per share on March 29, 2021, to a closing price of $368.96 on March 30, 2021.

7. Then, right before the market closed on July 13, 2021, *Reuters* published an article reporting that European Union regulators were demanding concessions from GRAIL as part of its review of the acquisition. This news caused the price of the Company common stock to decline over 4.6%, from a closing price of $483.52 per share on July 13, 2021, to a closing price of $460.92 per share on July 14, 2021.

8. After the market closed on August 18, 2021, the Company announced that it had closed its acquisition of GRAIL. On this news, the price of the Company common stock declined nearly 7.9%, from a closing price of $510.61 on August 18, 2021, to a closing price of $470.36 on August 19, 2021.

9. On Sunday, January 16, 2022, *The Financial Times* published an article reporting that the Company's CEO was "confident Illumina would prevail in the case launched against [European Union regulators] which [the Company] argues has no jurisdiction to investigate the GRAIL deal." In response, the price of the Company common stock declined more than 5.4%, from a closing price of $405.14 per share on January 14, 2022, to a closing price of $383.13 on January 18, 2022.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

3

10.     Then, before the market opened on May 1, 2023, Carl Icahn published an open letter to Illumina shareholders, questioning the GRAIL acquisition and requesting that the Company's Board of Directors ("Board") "bring in an outside – and demonstrably independent – law firm and forensic accounting team to investigate and address these questions publicly."  The Company responded just before the market closed on May 1, 2023, by filing a Proxy Statement with the SEC on Schedule 14A, stating "none of Illumina's directors . . . has ever held any equity interests in GRAIL" and "[a]t the time of Illumina's various investment rounds in GRAIL, no individuals at Illumina were investors in GRAIL. . . . and did not otherwise receive any GRAIL equity."  On this news, the price of the Company's common stock declined more than 5%, from a closing price of $205.56 on April 28, 2023, to a closing price of $195.16 on May 2, 2023.

11.     On May 25, 2023, the Company held its shareholder vote, culminating with Carl Icahn winning one seat on the Company's Board.  This caused the price of the Company common stock to decline by nearly 9%, from a closing price of $212.65 per share on May 24, 2023, to a closing price of $193.53 per share on May 25, 2023.

12.     Then, after the market closed on June 26, 2023, the Company filed a Current Report with the SEC on Form 8-K.  In that report, the Company announced a "multiyear plan to realign its operating expenses" and plans to reduce its annualized run rate by at least $100 million.  On this news, the price of Illumina common stock declined 4.4%, from a closing price of $191.88 on June 26, 2023, to a closing price of $183.43 on June 27, 2023.

13.     On August 10, 2023, after the market closed, the Company disclosed that it was the target of an SEC investigation. In response, the price of Illumina common stock declined more than 2.5%, from a closing price of $185.12 on August 10, 2023, to a closing price of $180.48 on August 11, 2023.

14. Following this, on October 12, 2023, the European Union ("EU") ordered the Company to unwind its transaction with GRAIL, having determined the acquisition to be anti-competitive, in order to "restore the situation prevailing before the completion of the acquisition" (the "EU Divestiture Order").

15. Then, after the market closed on October 17, 2023, Carl Icahn filed a derivative and class action lawsuit in Delaware Court of Chancery against current and former members of Illumina's board of directors. In response, the price of Illumina common stock declined more than 5.6%, from a closing price of $131.87 on October 17, 2023, to a closing price of $124.45 on October 18, 2023.

16. Finally, after the market closed on November 9, 2023, Illumina announced it would be taking an $821 million write down related to GRAIL. On this news, the price of Illumina common stock declined more than 8%, from a closing price of $106.98 on November 9, 2023, to a closing price of $98.37 on November 10, 2023.

## JURISDICTION

17. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 as the claims asserted herein arise under Sections 10(b), and 21D of the Securities Exchange Act of 1934 ("Exchange Act"). This Court also has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

19. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) the Company maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this

District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

20.    In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

### Plaintiff

21.    Plaintiff is, and was at relevant times, a shareholder of the Company. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

22.    ***Nominal Defendant Illumina*** is incorporated under the laws of Delaware with its principal executive offices located in San Diego, California. Illumina's common stock trades on the NASDAQ exchange under the symbol "ILMN."

### Director Defendants

23.    ***Defendant Frances Arnold*** ("Arnold") has served as a director of the Company since 2016.   Defendant Arnold also serves as a member of the Nominating/Corporate Governance Committee and Chair of the Science and Technology Committee. Defendant Arnold was involved in the decision to close the GRAIL acquisition and later made and/or approved misleading disclosures about the GRAIL acquisition in the Company's SEC filings.

24.     ***Defendant Caroline Dorsa*** ("Dorsa") has served as a director of the Company since January 2017.  Defendant Dorsa also serves as the Chair of the Audit Committee. Defendant Dorsa was involved in the decision to close the GRAIL acquisition and later made and/or approved misleading disclosures about the GRAIL acquisition in the Company's SEC filings.

25.     ***Defendant Robert S. Epstein*** ("Epstein") has served as a director of the Company since November 2012.  Defendant Epstein also serves as a member of the Compensation Committee and Chair of the Nominating/Corporate Governance Committee. Defendant Epstein was involved in the decision to close the GRAIL acquisition and later made and/or approved misleading disclosures about the GRAIL acquisition in the Company's SEC filings.

26.     ***Defendant Scott Gottlieb*** ("Gottlieb") has served as a director of the Company since February 2020.  Defendant Gottlieb also serves as a member of the Compensation Committee and the Nominating/Corporate Governance Committee. Defendant Gottlieb was involved in the decision to close the GRAIL acquisition and later made and/or approved misleading disclosures about the GRAIL acquisition in the Company's SEC filings.

27.     ***Defendant Gary S. Guthart*** ("Guthart") has served as a director of the Company since December 2017.  Defendant Guthart also serves as a member of the Audit Committee and the Science and Technology Committee.  Defendant Guthart was involved in the decision to close the GRAIL acquisition and later made and/or approved misleading disclosures about the GRAIL acquisition in the Company's SEC filings.

28.     ***Defendant Philip Schiller*** ("Schiller") has served as a director of the Company since July 2016.  Defendant Schiller also serves as a member of the Nominating/Corporate Governance Committee and the Science and Technology Committee. Defendant Schiller was involved in the decision to close the GRAIL

acquisition and later made and/or approved misleading disclosures about the GRAIL acquisition in the Company's SEC filings.

29.     **Defendant Sue Siegel** ("Siegel") has served as a director of the Company since February 2019.  Defendant Siegel also serves as the Chair of the Compensation Committee. Defendant Siegel was involved in the decision to close the GRAIL acquisition and later made and/or approved misleading disclosures about the GRAIL acquisition in the Company's SEC filings.

30.     **Defendant Andrew Teno** ("Teno") has served as a director of the Company during the relevant period.  Defendant Teno also serves as a member of the Compensation Committee.

31.     **Defendant Scott B. Ullem** ("Ullem") has served as a director since 2023.  Defendant Ullem also serves as a member of the Audit Committee.

32.     Defendants Arnold, Dorsa, Epstein, Gottlieb, Guthart, Schiller, Siegel, Teno, and Ullem are sometimes referred to herein collectively as the "Director Defendants."

**Former Officer and Director Defendants**

33.     **Defendant Francis A. deSouza** ("deSouza") was the Company's Chief Executive Officer ("CEO") from 2016 to June 11, 2023. Defendant deSouza spearheaded the GRAIL acquisition and made and/or approved misleading disclosures regarding the same. In Q1 2022, after the GRAIL acquisition, Defendant deSouza received a special grant of stock options from the Compensation Committee (Defendants Dorsa, Epstein, and Guthart) which contributed to the $25 million in long-term equity compensation that Defendant deSouza received from the Company in 2022. In total, the Company paid Defendant deSouza $52,819,424 for his service as CEO for fiscal years 2020-22.

34.     **Defendant John Thompson** ("Thompson") was the Chairman on the Company's Board of Directors from May 2021 to May 25, 2023 when he was voted off the Board at the 2023 annual stockholder meeting.

35.     **Defendant Sam A. Samad** ("Samad") served as Chief Financial Officer ("CFO") of the Company from 2017 until July 2022.

36.     The Director Defendants along with Defendants deSouza, Thompson, and Samad are collectively referred to herein as the "Individual Defendants."

**Non-Parties**

37.     **Non-Party Stephen P. MacMillan** ("MacMillan") has served as Chair of the Board since June 2023.

38.     **Non-Party Jacob Thaysen** ("Thaysen") has served as CEO and a director of the Company since September 2023.

## SUBSTANTIVE ALLEGATIONS

**Background**

39.     Illumina is a leading genetic and genomic analysis company with a portfolio of integrated sequencing and microarray systems, consumables, and analysis tools designed to accelerate and simplify genetic analysis.  In 2015, Illumina formed GRAIL as a corporate subsidiary to develop a blood-based cancer detection test, enabled by the Company's sequencing technology, with the power to detect multiple types of cancer in asymptomatic individuals through a single blood draw.

40.     In 2016, the Company raised $100 million for GRAIL from several new investors. At this time, Illumina retained 55% of GRAIL's equity, along with 90% of GRAIL's voting power.  However, in February 2017, the Company Illumina spun off GRAIL and retained a stake of approximately 20%.

41.     Illumina told investors that it was spinning off GRAIL "to encourage investment into many different NGS [next-generation sequencing]-based cancer detection companies" so that the world would have "as many shots on goal as

possible." The Company stated that "reducing its ownership in GRAIL" would "level the playing field" and "accelerate the liquid biopsy market for all."[1]

42.     After GRAIL raised $1.9 billion through venture capital and strategic partners, Illumina announced plans to reacquire GRAIL in September 2020 for approximately **$8 billion** in cash and stock consideration. On September 9, 2020, GRAIL registered with the SEC for an Initial Public Offering. The acquisition was completed on August 18, 2022 over the objection of the EU's European Commission ("EC").

## **MATERIALLY FALSE AND MISLEADING STATEMENTS**

43.     Throughout the Relevant Period, the Company continuously highlighted the benefits of its acquisition of GRAIL to the public and misled shareholders on the Company's reasons for entering into the acquisition. Indeed, Defendant deSouza claimed that the deal was "a matter not of corporate expansion but life and death," and that the Board had a "moral obligation" to close the deal.

44.     In the Company's September 21, 2020 press release announcing the acquisition of GRAIL, the Company touted the benefits of the acquisition, stating that the following were "strategic benefits" for the Company:

●      Increases Illumina's Directly Accessible Total Addressable Market and Offers Multiple Future Growth Opportunities. GRAIL extends Illumina's portfolio to include cancer screening, diagnosis and cancer monitoring, creating a portfolio of best-in-class, proprietary tests in each of the major oncology testing application areas. Oncology test utilization and payor coverage is accelerating, and the total NGS

---

[1]     *In the Matter of Illumina, Inc. and GRAIL, Inc.*, FTC Matter/File Number 201 0144, Dkt. No. 9401, at 60 (Mar. 31, 2023) (OPINION OF THE COMMISSION).

oncology opportunity is expected to grow at a CAGR of 27% to $75 billion in 2035.

● Accelerates Adoption of NGS-Based Early Multi-Cancer Detection Test to Reach More Patients Faster. Illumina plans to leverage its global scale, manufacturing and clinical capabilities to support GRAIL's commercialization efforts, realize the total addressable market potential and drive significant growth in the clinical value chain.

● Enhances Illumina's Position in Clinical Genomics. NGS is poised to revolutionize oncology care, and this acquisition allows Illumina to participate more fully in the high value clinical solutions that are enabled by its NGS sequencing technology. With GRAIL, Illumina will continue as a leading sequencing innovator and partner, while also becoming a proprietary test provider.

45.    In the same press release, Defendant deSouza stated that:

Together, we have an important opportunity to introduce routine and broadly available blood-based screening that enables early cancer detection when treatment can be more effective and less costly. Multi-cancer early detection is better for patients, their physicians, and payors. As we accelerate our path to clinical leadership and the path to multi-cancer early detection, we will continue to drive significant value creation for our stockholders.

46.    October 29, 2020, the Company held an earnings call for the third quarter of 2020 for investors and analysts (the "3Q20 Earnings Call").  In the 3Q20 Earnings Call, Defendant deSouza stated:

We believe our planned acquisition of GRAIL will accelerate a new era of early cancer detection, transforming cancer survivability and opening up the largest clinical application of genomics we've seen.  We look forward to welcoming our GRAIL colleagues to Illumina when

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

11

the acquisition closes. Upon close, we expect to operate GRAIL as a division within Illumina. We remain committed to supporting all of Illumina's customers and ensuring that innovators who wish to develop NGS-based tests have continued access to our technologies.

47.    Additionally, in the "Questions and Answers" portion of the 3Q20 Earnings Call, an analyst asked, "one of the key questions that has emerged . . . is the approach that Illumina took to GRAIL's acquisition in light of another multi-cancer liquid biopsy acquisition this week . . . could you elaborate, if there is anything . . . that gives you a greater confidence and a higher valuation." In response, Defendant Samad stated:

What attracted us to GRAIL was its unique position in that market in terms of being the closest to having a commercial test and in terms of having the performance characteristics, consistent with being closer to having a commercial test. So, GRAIL is looking to launch its test next year and that will likely make them the first player into the market. We have also undertaken by far some of the largest clinical studies in that space. And so, they have over 100,000 people enrolled in the studies that they've done and generated quite a remarkable bolus of data associated with their test. And then the performance characteristics of their tests are very strong. So, for the 12 deadliest cancers, they have a sensitivity in the high-60% with a false-positive rate of less than 1%, which really does represent our best-in-class product at this time in the market.

What we also like to is that the only player at this point that has FDA approval in terms of being able to run an IDE study to return results to patients and so they are working with some of the premier healthcare systems, including the Mayo Clinic, Cleveland, Oregon Health System, the Intermountain Health System, Dana-Farber, Sutter Health and so they already have their gallery test in the hands of doctors returning results to patients as part of the study. And so, having that FDA approval is also very attractive is and all of that obviously factored into the price associated with GRAIL.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

12

48.   In the Company's quarterly report for the period ended September 27, 2020, filed with the SEC on October 30, 2020 on a Form 10-Q (the "3Q20 10-Q"), the Company stated that "[w]e believe that our acquisition of GRAIL will accelerate the adoption of NGS-based early multi-cancer detection tests, enhance our position in Clinical Genomics, and increase our directly accessible total addressable market." The 3Q20 10-Q was signed by Defendant Samad.

**THE TRUTH BEGINS TO EMERGE, BUT FALSE**
**AND MISLEADING STATEMENTS CONTINUE TO BE MADE**

49.   On March 30, 2021, the Federal Trade Commission ("FTC") announced that it filed an administrative complaint and authorized a federal lawsuit to block Illumina's proposed acquisition of GRAIL.  The FTC complaint alleged that the proposed acquisition of GRAIL was anticompetitive and would diminish innovation in the United States market for multi-cancer early detection tests. The FTC sought and obtained a temporary restraining order ("TRO") prohibiting the deal from closing pending a trial on the FTC's request for a preliminary injunction restraining the deal.

50.   The Company issued a press release on March 30, 2021 in response to the FTC's announcement.  In the press release, the Company stated that it "disagrees with, and will oppose, the U.S. Federal Trade Commission (FTC)'s challenge to its previously announced acquisition of GRAIL."  The March 30, 2021 press release touted the benefits of the acquisition, stating:

> Illumina originally founded GRAIL five years ago and the two companies do not compete in any way. In reuniting the two organizations, Illumina will leverage its global scale of manufacturing and clinical capabilities, as well as its global regulatory and reimbursement expertise, to bring early-stage, multi-cancer testing to

patients more quickly and more affordably, resulting in more lives being saved. …

Illumina strongly believes that acquiring GRAIL is in the best interests of patients, is procompetitive, and benefits the multi-cancer early detection field as a whole.

51.     On this news, the Company's stock price fell $25.44 per share, or approximately 6.5%, going from $394.40 at open on March 30, 2021 to close at $368.96 on March 30, 2021.

52.     On or around April 19, 2021, the EC accepted a request from France – joined by Belgium, Greece, Iceland, the Netherlands, and Norway – to assess the proposed acquisition of GRAIL under the EU Merger Regulation. The EC asserted its jurisdiction to review the Company's acquisition of GRAIL and formally commenced its own preliminary investigation into the deal.  The Commission stated that "the transaction threatens to significantly affect competition within the territory of the Member States making the request and GRAIL's competitive significance is not reflected in its turnover."[2]

53.     The EC investigation triggered standstill obligations under the EU Merger Regulation, which provides that any merger under review "shall not be implemented" until the companies subject to the review have received clearance to do so. Council Regulation No. 139/2004, Art. 7(1). The FTC, relying expressly on the Company's inability to the close the deal in the face of these standstill

---

[2]     European Commission, *Mergers: Commission starts investigation for possible breach of the standstill obligation in Illumina / GRAIL transaction* (Aug. 20, 2021) (PRESS RELEASE), https://ec.europa.eu/commission/presscorner/detail/en/ip_21_4322 (Last accessed Mar. 8, 2024).

obligations, dismissed its complaint against the Company (and the accompanying TRO) without prejudice to renew.

54. Despite these announcements, Illumina continued to double down on its acquisition of GRAIL, and the benefits to shareholders and the public associated therewith.

55. On April 20, 2021, in response to the European Commission's announcement, the Company issued a press release stating that the Company "disagrees with the European Commission's Directorate-General for Competition's decision to review Illumina's acquisition of GRAIL."  In the press release, Defendant deSouza emphasized the benefits of the acquisition and the Company's reasons for the acquisition, stating that "[r]euniting GRAIL and Illumina will allow us to bring GRAIL's breakthrough early detection multi-cancer test to patients across the world faster and consequently save lives."

56. On April 27, 2021, the Company held its earnings call for the first quarter of 2021 for investors and analysts ("Q121 Earnings Call"), where Defendant deSouza stated that:

> Our commitment to the advancement of human health is an Illumina core tenet, which brings me to GRAIL. We are pleased with the progress GRAIL is making and remain committed to pursue the completion of the GRAIL acquisition. GRAIL recently presented affirmative data from its CCGA3 study at the American Association for Cancer Research Annual Meeting and is expecting to launch Galleri, its breakthrough multi-cancer early detection screening test, in Q2.  One of the many reasons we decided to acquire GRAIL was to accelerate patient access to breakthrough multi-cancer early detection blood tests, which could save tens of thousands of lives. We are committed to supporting all our customers and strongly believe that our acquisition of GRAIL is pro-competitive. We expect the acquisition to accelerate the early detection of cancer market as a whole. We saw a similar dynamic play out in the noninvasive prenatal testing market where,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

after Illumina's entry, the market grew and prices decreased, making these important tests accessible to a much larger population of pregnant women.

57.     On May 13, 2021, Defendant Samad attended the Bank of America Global Research Healthcare Conference on behalf of the Company. Defendant Samad stated, in response to a question by an analyst about why the Company chose to acquire GRAIL:

> So why GRAIL? I mean it's the single most compelling, I would say, application that's going to be coming up in human health over the next, I don't know, how many years. But we're talking about a $60 billion TAM, you're talking about the potential to save lives. You're talking about the potential to save significant costs in health care when you're able to catch cancer early in stages 1 and 2 as opposed to stages 3 and 4.
>
> In addition to that, we believe the profile of the Galleri product is well above and well beyond any other product that's to be introduced in that space with regards to their positive predictive value, the specificity and sensitivity of the product and the number of clinical trials that have been undergone in that space to prove that out. So that's why GRAIL and why now. I mean we think there's tremendous momentum in this market where we want to participate more directly in that clinical ecosystem.

58.     Then on July 13, 2021, it was revealed that the European Union was demanding concessions from the Company in connection with the European Commission's decision to review the Company's acquisition of GRAIL. On this news, the Company's stock price fell $22.60 per share, or approximately 4.7%, to close at $460.92 on July 14, 2021.

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

16

59.    On July 22, 2021, following its preliminary investigation, the EC opened an "in-depth investigation into the proposed transaction."[3] The EC stated that:

> Following its preliminary investigation, the Commission has concerns about the impact of the transaction on the development and supply of NGS-based cancer detection tests. The Commission is concerned that, as a result of its combination with GRAIL, Illumina could engage in vertical input foreclosure strategies given its leading position in the NGS systems that are crucial inputs for the development and commercialisation of NGS-based cancer detection tests. The preliminary investigation suggests that Illumina could have the ability to engage in these foreclosure strategies given its leading position in NGS systems and that Illumina could have an economic incentive to foreclose GRAIL's rivals.

60.    However, the Individual Defendants once again chose to double down on the Company's reasons for acquiring GRAIL and the benefits associated therewith.  The Company held an earnings call for the second quarter of 2021 on August 5, 2021 (the "2Q21 Earnings Call").  In the 2Q21 Earnings Call, Defendant deSouza, when asked about the Company's acquisition of GRAIL and the issues encountered in the process, stated:

> We continue to believe that this deal is procompetitive. We continue to believe that this deal will result in the savings of tens of thousands of lives that would not be saved if we didn't buy GRAIL just simply because we can accelerate the business. So to answer the question, we

---

[3] European Commission, *Mergers: Commission opens in-depth investigation into proposed acquisition of GRAIL by Illumina* (July 22, 2021) (PRESS RELEASE), https://ec.europa.eu/commission/presscorner/detail/en/IP_21_3844 (Last accessed Mar. 8, 2024).

are committed to working through this deal through that time frame through the end of the year.

61.     Then, on August 18, 2021, in the face of the pending FTC litigation, ongoing EC investigations, and the standstill obligations under European law, certain of the Individual Defendants caused the Company to complete the acquisition of GRAIL, which was announced via a press release.  On this news, the Company's stock price fell $40.25 per share, or approximately 7.9%, to close at $470.36 on August 19, 2021.

62.     The closing of the GRAIL acquisition in violation of EU law, however, was condemned by European regulators. The EC's Executive Vice President, Margrethe Vestager, stated:

> We deeply regret Illumina's decision to complete its acquisition of GRAIL, while our investigation into the transaction is still ongoing.
>
> Companies have to respect our competition rules and procedures. Under our *ex-ante* merger control regime companies must wait for our approval before a transaction can go ahead. This obligation, that we call standstill obligation, is at the heart of our merger control system and we take its possible breaches very seriously. This is why we have decided to immediately start an investigation to assess whether Illumina's decision constitutes a breach of this important obligation.

63.     Following this, the EC opened an additional investigation "to assess whether Illumina's decision to complete its acquisition of GRAIL, while the Commission's in-depth investigation into the proposed transaction is still ongoing, constitutes a breach of the "standstill obligation" under Article 7 of the Merger Regulation." The EC further stated that "[t]he Commission can impose fines on companies that, either intentionally or negligently, breach the standstill obligation

which may ***reach up to 10% of the companies' aggregate turnover***, pursuant to Article 14 of the Merger Regulation."[4]

64.   Despite this, the Individual Defendants continued to mislead the public about the reasons for the Company's acquisition of GRAIL. For instance, on September 13, 2021, Defendant deSouza attended the Morgan Stanley Global Healthcare Conference on behalf of Illumina, where, in response to a question about Illumina's reasons for acquiring GRAIL, Defendant deSouza stated:

> In addition to the considerations around shareholder value and making sure we're doing the move that long term maximizes shareholder value, we also felt a moral obligation to close the deal because the potentially life savings, the savings life associated with doing this deal are so substantial. By accelerating GRAIL in terms of its global distribution and the accessibility of the tests globally, we will save many thousands of lives by getting this test into the hands of more people and making it more affordable than GRAIL would do on their own. And so, there was a moral element here, too, by saying in addition to creating long-term shareholder value, we have an obligation to have this deal reviewed and get to a decision because of the life-saving potential of doing this deal. And so all those considerations came together and that's how we made the decision.

65.   On September 20, 2021, the EC issued a further press release which announced that the "European Commission has sent a Statement of Objections to Illumina and GRAIL informing them of the interim measures it intends to adopt

---

[4] European Commission, *Mergers: Commission starts investigation for possible breach of the standstill obligation in Illumina / GRAIL transaction* (Aug. 20, 2021) (PRESS RELEASE), https://ec.europa.eu/commission/presscorner/detail/en/ip_21_4322 (Last accessed Mar. 8, 2024).

following the companies' alleged breach of the standstill obligation under the EU Merger Regulation."[5] The EC further stated:

> Under our rules, companies have to wait for the Commission's clearance before implementing deals that are subject to our review. The standstill obligation is a cornerstone of our ex-ante merger control regime which aims at preventing harmful effects to competition while our review is ongoing. ***This is the first time companies openly implement their deal while we are carrying out an in-depth investigation***. Today, we send our objections to the companies informing them of the measures we intend to take to prevent the potentially detrimental impact of the transaction on the competitive structure of the market.

***

> In today's Statement of Objections, the Commission takes the preliminary view that, by closing their deal, Illumina and GRAIL breached the standstill obligation and that interim measures to restore or maintain effective competition are appropriate in this case.
>
> ***This is the first time the Commission intends to adopt interim measures following an unprecedented early implementation of a concentration it is investigating***. The interim measures aim to prevent the potentially irreparable detrimental impact of the transaction on competition, as well as possible irreversible integration of the merging parties, pending the outcome of the Commission's merger investigation.
>
> The envisaged interim measures take note of Illumina's own unilateral proposal to hold GRAIL separate, but go beyond Illumina's proposal in

---

[5] European Commission, *Mergers: The Commission adopts a Statement of Objections in view of adopting interim measures following Illumina's early acquisition of GRAIL* (Sep. 20, 2021) (PRESS RELEASE), https://ec.europa.eu/commission/presscorner/detail/en/ip_21_4804 (Last accessed Mar. 8, 2024).

addressing a number of serious shortcomings identified in that proposal.

(Emphasis added).

66.     Then, on October 29, 2021, it was revealed that the EC ordered the Company to adopt interim measures to ensure that the Company and GRAIL were kept separate and run by independent managers. The EC stated that "[t]his is the first time the Commission adopts interim measures following an unprecedented early implementation of a concentration" and that the measures "aim to prevent the potentially detrimental impact of the transaction on competition." Such interim measures included:[6]

- GRAIL shall be kept separate from Illumina and be run by (an) independent Hold Separate Manager(s), exclusively in the interest of GRAIL (and not of Illumina).

- Illumina and GRAIL are prohibited from sharing confidential business information, except where the disclosure is required to comply with the law or in line with the ordinary course of their supplier-customer relationship.

- Illumina has the obligation to finance additional funds necessary for the operation and development of GRAIL.

- The business interactions between the parties shall be undertaken at arm's length, in line with industry practice, hence without unduly favouring GRAIL to the detriment of its competitors.

---

[6] European Commission, *Mergers: Commission adopts interim measures to prevent harm to competition following Illumina's early acquisition of GRAIL* (Oct. 29, 2021) (PRESS RELEASE), https://ec.europa.eu/commission/presscorner/detail/en/ip_21_5661 (Last accessed Mar. 8, 2024).

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- GRAIL shall actively work on alternative options to the transaction to prepare for the possible scenario in which the deal would have to be undone in case the Commission were to declare the transaction incompatible with the internal market.

67.    The EC, in announcing these interim measures, further stated: "The measures are legally binding on both Illumina and GRAIL. The measures will be applicable during an interim period, pending the final outcome of the Commission's in-depth merger investigation. Their compliance will be closely monitored by a Monitoring Trustee to be approved by the Commission. Should the parties fail to comply with any of the measures, they would face the risk of penalty payments of up to 5% of their average daily turnover and/or fines of up to 10% of their annual worldwide turnover under Articles 15 and 14 of the EU Merger Regulation respectively."

68.    However, the Individual Defendants again touted the benefits of the acquisition to shareholders.  On November 4, 2021, the Company held its earnings call for the third quarter of 2021 for investors and analysts (the "3Q21 Earnings Call"). In the 3Q21 Earnings Call, Defendant deSouza stated "[i]n August, we closed our acquisition [of GRAIL], which we believe we believe will help accelerate patient access and affordability for multi-cancer early detection screening."

69.    Furthermore, in the 3Q21 Earnings Call, Defendant deSouza, in response to a question about the future of GRAIL's revenue performance given the regulatory investigations, stated:

> But what we want to do is make sure that GRAIL continues to create value because what that means is that no matter what scenario plays out in the event that we get done and we have GRAIL and we can grow it, that's a huge, huge success, obviously, and hugely valuable for our shareholders. But we know that if we create a lot of value in GRAIL, then no matter what the regulatory outcome is, it's still a big win, not

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

only for people who are getting screened but also for our shareholders because we'll have an asset significantly appreciated. And even if you look at the progress that's been made at GRAIL since we announced the deal, right? So since we announced the deal, they've published some of their study results. They have launched a product on the schedule they set in June. They have initiated -- not only signed the NHS deal but started the rollout to 140,000 customers and signed up some other healthcare systems and employers in the U.S. So it's clear the business has created significant value from maybe 12, 15 months ago when we announced the deal.

70.     On May 12, 2022, Defendant Samad attended the Bank of America Healthcare Conference on behalf of the Company, where he touted the benefits of Illumina's acquisition of GRAIL to shareholders and analysts.  Defendant Samad stated that the GRAIL test "and other revenue from GRAIL could potentially be even larger than our core business . . . that's how transformational this product is."

71.     Then, on September 6, 2022, the European Commission announced that it completed its review of the Company's acquisition of GRAIL and that it had "prohibited, under the EU Merger Regulation, the implemented acquisition of GRAIL by Illumina." The EC's Executive Vice President, Margrethe Vestager, stated:[7]

Today we prohibited Illumina's implemented acquisition of GRAIL. In a race with other companies, GRAIL is developing a blood-based early cancer detection test. If successful, these tests will revolutionise our fight against cancer and help to save millions of lives. Illumina is currently the only credible supplier of a technology allowing to develop

[7] European Commission, *Mergers: Commission prohibits acquisition of GRAIL by Illumina* (Sep. 6, 2022) (PRESS RELEASE), https://ec.europa.eu/commission/presscorner/detail/en/ip_22_5364 (Last accessed Mar. 8, 2024).

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

and process these tests. With this transaction, Illumina would have an incentive to cut off GRAIL's rivals from accessing its technology, or otherwise disadvantage them. It is vital to preserve competition between early cancer detection test developers at this critical stage of development. As Illumina did not put forward remedies that would have solved our concerns, we prohibited the merger.

72.     On the same day, the Company issued a press release, stating that it was "disappointed with the European Commission's decision" and again touted the benefits of the acquisition, stating that "[t]he merger of Illumina and GRAIL would usher in a transformational phase in the detection and treatment of cancer by facilitating equal and affordable access to the life-saving early cancer detection Galleri test."

73.     On October 3, 2022, the Company held its annual "Investor Day" meeting for investors and analysts, where Defendant deSouza stated, "we believe Illumina's acquisition of GRAIL can have lifesaving benefits for people who have cancer and don't know about it. And we also believe it creates long-term shareholder value for Illumina's shareholders, which is why we did the deal."

74.     On October 28, 2022, the EC announced that it was renewing the interim measures imposed on the Company on September 6, 2021, which "provide that: (i) GRAIL shall be kept separate from Illumina and be run by independent Hold Separate Managers, exclusively in the interest of GRAIL (and not of Illumina); (ii) Illumina and GRAIL are prohibited from sharing confidential business information, subject to very limited exceptions and safeguards; (iii) Illumina has the obligation to provide the funds necessary for the operation of GRAIL and the development of its pipeline cancer detection tests; (iv) the business interactions between the parties shall be at arm's length, in line with industry practice, without unduly favouring

GRAIL to the detriment of its competitors; and (v) Illumina and GRAIL shall actively work to prepare for a potential order to unwind the transaction."[8]

75.    Then, on December 5, 2022, the EC sent a Statement of Objections to Illumina and GRAIL outlining the restorative measures it intended to adopt, "which include: (a) **the divestment measures** that the Commission considers Illumina must implement to unwind the transaction with GRAIL and (b) **the transitional measures** that Illumina and GRAIL need to comply with until Illumina has dissolved the transaction."[9] The EC went on to specifcy:

> Specifically, the **divestment measures** must be implemented in line with the following principles:
>
> - First, the dissolution of the transaction must **restore GRAIL's independence from Illumina**, to the same level that GRAIL had prior to the completion of the transaction.
> - Second, **GRAIL must be as viable and competitive** after the divestment as it was before Illumina's acquisition, to ensure that the innovation race between GRAIL and its rivals can continue as before.
> - Finally, the **divestment must be executable swiftly and with sufficient certainty**, so that the pre-transaction situation can be restored promptly.

---

[8] European Commission, *Mergers: Commission renews interim measures to ensure Illumina and GRAIL continue to be kept separate following the prohibition decision* (Oct. 28, 2022) (DAILY NEWS), https://ec.europa.eu/commission/presscorner/detail/en/mex_22_6467 (Last accessed Mar. 8, 2024).

[9] European Commission, *Mergers: The Commission adopts a Statement of Objections outlining measures to unwind Illumina's blocked acquisition of GRAIL* (Dec. 5, 2022) (PRESS RELEASE), https://ec.europa.eu/commission/presscorner/detail/en/IP_22_7403 (Last accessed Mar. 8, 2024).

As regards the envisaged **transitional measures:**

- They will **ensure that Illumina and GRAIL remain separate** until the transaction is unwound in order to prevent further integration of GRAIL into Illumina's business and subsequently irreparable harm to competition.
- They also oblige Illumina to maintain **GRAIL's viability**.
- They will **replace the interim measures** adopted by the Commission on 28 October 2022 and that are currently in force.

\*\*\*

In case of non-compliance, the Commission is empowered to impose periodic penalty payments. Moreover, companies failing to comply with interim measures can be fined up to 10% of their annual worldwide turnover under Article 14 of the EU Merger Regulation.

(Emphasis in original)

76.    On February 17, 2023, the Company filed its annual report for the fiscal year ended January 1, 2023 on a Form 10-K with the SEC (the "2023 10-K"), which stated that "[w]e believe our acquisition of GRAIL will accelerate the adoption of next-generation sequencing (NGS) based early multi-cancer detection tests, enhance our position in Clinical Genomics, and increase our directly accessible total addressable market." The 2023 10-K was signed by Defendants deSouza, Goswami, Thompson, Arnold, Dorsa, Epstein, Gottlieb, Guthart, Schiller, and Siegel.

77.    On April 3, 2023, the FTC announced that it issued an order and opinion requiring the Company to divest GRAIL.

78.    Then, on April 24, 2023, an article was posted on *Nongaap Investing*, stating that the Company insiders received a financial windfall "in excess of $500 million" from the spinoff and reacquisition of GRAIL. The author of the article alleged that "up to 70 million Grail shares went to insiders, right out-of-the-gate."

79.    On April 28, 2023, Carl C. Icahn ("Icahn"), who was the beneficial owner of approximately 1.4% of the outstanding shares of the Company as of

February 17, 2023, issued an open letter to Illumina shareholders. Therein, he drew attention to the "Malignant Governance" blog post and called for the Company to conduct an unbiased investigation into the issues, stating:

> Additionally, we read an interesting piece recently on Illumina, entitled "Malignant Governance," which asks the question that has been on the mind of virtually every long term shareholder with whom we have spoken: "***How much money did Illumina insiders (past and present) make from splitting-off and subsequently re-acquiring Grail?***" We have no idea if the allegations are true.  However, based on what we do know of the past actions and lack of transparency exhibited by Illumina CEO Francis deSouza and the incumbent directors, we would not be surprised at all if some or all of the assertions turned out to be accurate. <u>We therefore implore the board to bring in an outside – and demonstrably independent – law firm and forensic accounting team to investigate and address these questions publicly, with enough time prior to the upcoming annual meeting to allow shareholders to take the results into account when casting their votes for directors.</u> We believe that an unbiased investigation into these murky issues is necessary and appropriate, given the fact that the director election will in effect be a referendum on the entire GRAIL fiasco. Unfortunately, we believe that we will see pigs fly before we see such an investigation conducted by this board.

80.    In the May 1, 2023 letter, Carl Icahn also called for the Company to replace three of its directors with new "more qualified, independent" directors.

81.    In response, also on May 1, 2023, the Company issued a press release and shareholder letter in connection with the annual stockholder meeting to be held on May 25, 2023. Therein, the Company stated:[10]

## 2016 GRAIL spin-out from Illumina

---

[10]     Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

An inflammatory blog post, repeated by Icahn, incorrectly suggested that Illumina spun out and reacquired GRAIL in order to enrich Illumina's directors and executives. Icahn himself, however, admits "We have no idea if the allegations are true."

The allegations are completely false.

The facts are as follows:

- ***None of Illumina's directors involved in either the decision to sign or the decision to close the GRAIL acquisition*** – including our former CEO and Executive Chairman Jay Flatley, our current CEO Francis deSouza and each of Illumina's current directors – ***has ever held any entity interests in GRAIL***

- ***At the time of Illumina's various investment rounds in GRAIL, no individuals at Illumina were investors in GRAIL.*** Illumina's employees, executive officers and Board members were not permitted to participate in GRAIL investment rounds and did not otherwise receive any GRAIL equity.

- Illumina, Inc. was the founder of GRAIL and individuals employed by Illumina moved to GRAIL as part of the spin-out in 2016. Those who moved to GRAIL terminated their relationship with Illumina at the time of transition and directors and employees who remained at Illumina could not invest in GRAIL nor did they receive any GRAIL equity.

- ***No executive officers of Illumina held GRAIL shares at the signing or closing of the GRAIL acquisition***, other than Alex Aravanis, who Illumina had hired from GRAIL, and Mostafa Ronaghi, Illumina's former CTO, who received GRAIL shares upon joining GRAIL's board in May 2020. The economic interests and relationships of these individuals with GRAIL were fully disclosed to, and known by, Illumina and its Board, and, consistent with good corporate governance practices, both were

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

28

recused from any decisions to sign and close the GRAIL acquisition.

82.     On May 18, 2023, the Company issued a press release in advance of the 2023 stockholder meeting, which contained a letter from Defendant Thompson, stating in relevant part:

> On conflicts of interest, there is an important question I would like to put to bed: "Did any Illumina directors have a financial interest in GRAIL at the time of the acquisition?" This question is not a matter of interpretation or explanation. The answer is simply no. ***As we have said before, no director who oversaw any part of the GRAIL transaction has ever owned any equity interest in GRAIL – that includes Jay Flatley, Francis deSouza, myself, and any member of the Board now or at the time of acquisition.*** In addition, no executive officers of Illumina held GRAIL shares at the signing or closing of the GRAIL acquisition (including indirect ownership interests such as through trusts, LP or GP stakes in investment vehicles, or through derivative securities), other than Alex Aravanis, who Illumina had hired from GRAIL, and Mostafa Ronaghi, Illumina's former CTO, who received GRAIL shares upon joining GRAIL's Board in May 2020. The economic interests and relationships of these individuals with GRAIL were fully disclosed to, and known by, Illumina and its Board, and, consistent with good corporate governance practices, both were recused from any decisions to sign and close the GRAIL acquisition. In addition, Illumina's Board engaged Goldman Sachs as its financial advisor in connection with the GRAIL acquisition and Goldman, acting exclusively for Illumina, delivered a customary fairness opinion to Illumina's Board immediately prior to Illumina entering into the GRAIL acquisition agreement.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

29

83.     Then, On July 12, 2023, the EC fined Illumina and GRAIL €432 million and €1,000 respectively,[11] for implementing their proposed merger before approval by the Commission, in breach of EU merger control rules.[12] The EC found that:

- **Illumina** strategically weighed up the risk of a gun-jumping fine against the risk of having to pay a high break-up fee if it failed to takeover GRAIL. It also considered the potential profits it could obtain by jumping the gun, even if it were ultimately forced to divest GRAIL. It then intentionally decided to proceed and to close the deal while the Commission was still investigating the transaction that was ultimately prohibited. This is a **very serious infringement**, which requires the imposition of a **proportionate fine, with the aim of deterring such conduct**. In setting such a fine, the Commission considered Illumina's deliberate strategy, and took due account of the hold separate measures adopted by the company as a mitigating circumstance. The Commission is however subject to a statutory limit of 10% of Illumina's turnover, i.e. approximately €432 million, and thus ultimately imposed this amount as a fine.

- **GRAIL** was fully aware of the standstill obligation and yet **played an active role** in the infringement. For example, GRAIL took legal steps to enable the completion of the transaction, while it knew the Commission's in-depth review was ongoing. The Commission has however decided to impose only a **symbolic fine** of €1,000 on

[11] EUR 1 = USD 1.1022 on July 12, 2023. European Central Bank, *ECB Euro Foreign Exchange Reference Rates: US Dollar (USD)*, https://www.ecb.europa.eu/stats/policy_and_exchange_rates/euro_reference_exchange_rates/html/eurofxref-graph-usd.en.html (Last accessed Mar. 8, 2024).

[12] European Commission, *Mergers: Commission fines Illumina and GRAIL for implementing their acquisition without prior merger control approval* (July 12, 2023) (PRESS RELEASE), https://ec.europa.eu/commission/presscorner/detail/en/ip_23_3773 (Last accessed Mar. 8, 2024).

GRAIL as this is the first time it imposes a fine for gun-jumping on a target company.

(Emphasis in original).

84.    On August 9, 2023, in a press release, the Company stated that:

On July 12, 2023, the European Commission imposed a €432 million fine due to the completion of the GRAIL acquisition during the pendency of the European Commission's review. While expected and accrued for over the last year, Illumina believes that the fine is unlawful, inappropriate, and disproportionate, and is appealing the decision. Illumina plans to issue a guarantee and defer the payment of the fine pending the outcome of the appeal of the EU General Court's ruling that the European Commission has jurisdiction to review the GRAIL acquisition.

85.    The above statements identified were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose to investors: (i) that certain of the Company's insiders had personal financial motives for acquiring GRAIL; (ii) that, contrary to Illumina's attempts to discount Icahn's criticism, Icahn had accurately concluded that insiders' interests did not align with the Company's best interests; and (iii) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## THE TRUTH FULLY EMERGES

86.    On August 10, 2023, after the market closed, the Company revealed that the SEC was investigating the Company's statement regarding GRAIL. Specifically, in its Form 10-Q for the period ended July 2, 2023, Illumina stated:

In July 2023, we were informed that the staff of the SEC was conducting an investigation relating to Illumina and was requesting documents and communications primarily related to Illumina's acquisition of GRAIL and certain statements and disclosures concerning GRAIL, its products and its acquisition, and related to the conduct and compensation of certain members of Illumina and GRAIL management, among other things. Illumina is cooperating with the SEC in this investigation.

87. On this news, the Company's stock price fell $4.64, or 2.5%, to close at $180.48 per share on August 11, 2023.

88. On October 12, 2023, the EC announced that it had "adopted, under the EU Merger Regulation [], restorative measures requiring Illumina to unwind its completed acquisition of GRAIL." The EC confirmed that:

Specifically, the **divestment measures** must be implemented in line with the following principles:

- First, the dissolution of the transaction must **restore GRAIL's independence from Illumina** to the same level enjoyed by GRAIL prior to the acquisition. Restoring GRAIL's independence will remove the harm to competition resulting from Illumina's ability and incentive to delay or disadvantage GRAIL's rivals.
- Second, **GRAIL must be as viable and competitive** after the divestment as it was before Illumina's acquisition. This will ensure that the innovation race between GRAIL and its rivals can continue in conditions similar to those in place before the transaction.
- Finally, the **divestment must be executable within strict deadlines and with sufficient certainty**, so that the pre-transaction situation can be restored in a timely manner.

Illumina can choose the appropriate divestment methods (e.g., via a trade sale, a capital markets transaction), provided that it follows all the principles mentioned above. Illumina has to submit a concrete divestment plan for the disposal of GRAIL, which **must be approved by the Commission**.

As regards the **transitional measures:**

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- They will ensure that **Illumina and GRAIL remain separate** until the transaction is unwound in order to prevent further integration of GRAIL into Illumina's business and subsequently irreparable harm to competition.
- They also oblige Illumina to maintain **GRAIL's viability** by continuing to fund GRAIL's cash needs on an ongoing basis to allow it to further develop and launch its early cancer detection test Galleri.
- They will **replace the interim measures** adopted by the Commission on 28 October 2022 and that are currently in force.

In case of non-compliance with the restorative measures, the Commission can impose periodic penalty payments of up to 5% of the average daily aggregate turnover of the company under Article 15 EUMR. Moreover, companies failing to comply with the restorative measures can be fined up to 10% of their annual worldwide turnover under Article 14 of the EUMR

(Emphasis in original).

89.     On October 17, 2023, Icahn filed a complaint against current and former directors of the Company, alleging direct and derivative claims of breaches of fiduciary duty.  The complaint was filed under seal, but according to *Reuters*, Icahn "told the 13D Monitor Active-Passive Investor Summit in New York on Tuesday that the lawsuit pertained to Illumina completing its acquisition of cancer diagnostic test maker Grail."

90.     On this news, the Company's stock price fell $7.42, or 5.6%, to close at $124.45 per share on October 18, 2023.

91.     Then, on October 20, 2023, after the market closed, Icahn filed a public version of his complaint against Illumina's insiders, alleging that "[t]he conflicted directors, poisoned by their personal stake in the matter, cannot be entrusted" with "matters of vital importance to Illumina."  The complaint states that "Illumina's extraordinary decision to close the GRAIL Acquisition has long given rise to questions regarding whether Illumina's directors and officers had personal financial

motives for closing the deal." The next sentence of the same paragraph is redacted from the public version of the complaint. The complaint also refers to other "Undisclosed Matters," which are also redacted from public view. However, the complaint alleges that Illumina's insiders "Entrench[ed] Themselves on the Board Through Misleading Disclosures and Other Machinations."

92. On this news, the Company's stock price fell $7.42 per share, or approximately 5.6%, to close at $124.45 per share on October 18, 2023.

93. The truth was fully revealed on November 9, 2023, when the Company filed its 3Q23 10-Q and revealed that its acquisition of GRAIL was not as beneficial as it had made it out to be, stating that the Company had taken "goodwill and intangible impairments of $821 million related to the GRAIL segment."

94. On this news, the Company's stock price fell $8.61 per share, or approximately 8%, to close at $98.37 per share on November 10, 2023.

95. Finally, on December 17, 2023, after the Fifth Circuit Court of Appeals issued an opinion finding that there was sufficient evidence supporting the FTC's ruling that Illumina is required to divest GRAIL, the Company announced that it was going to divest GRAIL, with the goal of finalizing the terms of the divestment by the second quarter of 2024.[13]

## DAMAGES TO THE COMPANY

**Securities Class Actions**

96. On November 10, 2023, a securities class action complaint was filed in the United States District Court for the Southern District of California against the

---

[13] Federal Trade Commission, *Statement Regarding Illumina's Decision to Divest Grail* (Dec. 18, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/12/statement-regarding-illuminas-decision-divest-grail (Last accessed Mar. 8, 2024).

Company and Defendants deSouza and Thompson. The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5, in the case captioned: *Kangas v. Illumina, Inc., et al.*, Case 3:23-cv-02082-LL-MMP (S.D. Cal.) ("Kangas Action")

97. On December 21, 2023, a securities class action complaint was filed in the United States District Court for the Southern District of California against the Company and Defendants deSouza and Thompson. The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5, in the case captioned: *Louisiana Sheriffs' Pension & Relief Fund v. Illumina, Inc., et al.*, Case 3:23-cv-02328-MMA-AHG (S.D. Cal.) ("LSPRF Action").

98. Also on December 21, 2023, a securities class action complaint was filed in the United States District Court for the Southern District of California against the Company and Defendants deSouza and Thompson. The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5, in the case captioned: *Roy v. Illumina, Inc., et al.*, Case 3:23-cv-02327-BEN-BGS (S.D. Cal.) ("Roy Action").

99. As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's former officers. The Company will continue to incur significant sums in relation to the above Securities Class Actions and any liability or settlement that results.

**Unjust Compensation**

100. At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

In 2022 alone, certain of the Individual Defendants unjustly received over $33 million, as follows:

| Defendant | 2022 Total Compensation ($) |
|---|---|
| deSouza | 26,752,197 |
| Samad | 3,062,815 |
| Thompson | 465,078 |
| Arnold | 400,078 |
| Dorsa | 415,078 |
| Epstein | 405,078 |
| Gottlieb | 385,078 |
| Guthart | 410,078 |
| Schiller | 395,078 |
| Siegel | 390,078 |
| **TOTAL** | **$33,080,636** |

101.   Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner.  Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

102.   However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein.  Because the Individual Defendants failed to carry out their respective duties, the compensation they received during the Relevant Period was excessive and undeserved.  As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**European Commission Fines**

103.   As detailed herein, the EC opened an in-depth investigation into Illumina's acquisition of GRAIL and subsequently blocked the GRAIL acquisition in September 2022 over concerns that it would have "significant anticompetitive

effects." Then, in October 2023, the EC fined Illumina €432 million (approx. $476 million) for implementing their proposed merger before approval by the Commission, in breach of EU merger control rules.

104.   According to the Company's Form 10-K, filed February 17, 2023, losses in 2022 alone increased by $4.2 billion, in part due to "a legal contingency of $458 million related to a potential fine we expect the [EC] to impose related to the closing of our acquisition of GRAIL."

105.   While the Company has not disclosed its exact costs incurred as a result of holding GRAIL under the EC's hold-separate order, those costs are estimated to likely exceed **$2 billion**.[14]

106.   Moreover, certain of the Individual Defendants have caused the Company to challenge the EC's determinations through appealing the EC's assertion of jurisdiction to review the GRAIL acquisition, appealing the EC's formal prohibition of the GRAIL acquisition, and appealing the EC's imposition of the interim measures, including the "hold separate" order.[15] Yet, not a single one of these challenges have been successful, thereby causing further harm to the Company.

**FTC Action**

---

[14] *See* Ed Hammond, *Illumina CEO's GRAIL Hunt Runs Into a Quagmire*, Bloomberg (Apr. 5, 2023) https://www.bloomberg.com/opinion/articles/2023-04-05/illumina-ceo-s-grail-hunt-runs-into-a-quagmire?embedded-checkout=true (Last accessed Mar. 8, 2024).

[15] EU General Court Case Nos. T-277/21, T-755/21, T-709/22, T-5/23, and T-591,23; EU Court of Justice Case No. 6-611/22P.

107. The FTC challenged Illumina's GRAIL acquisition in March 2021, alleging that the deal would diminish innovation in the U.S. market for multi-cancer early detection tests while increasing prices and decreasing choices.[16]

108. In April 2023, the FTC issued an opinion and order reversing the Administrative Law Judge's dismissal of the proceeding and requiring Illumina to divest GRAIL.[17] Then, in June 2023, Illumina petitioned the Fifth Circuit to review the Commission's order and opinion, and the Fifth Circuit heard arguments in the case in September 2023.

109. On December 15, 2023, the Fifth Circuit issued an opinion in the case finding that there was substantial evidence supporting the Commission's ruling that the deal was anticompetitive. The Fifth Circuit vacated the Commission's order and remanded it for further proceedings based on the standard the Commission applied when reviewing one aspect of Illumina's rebuttal evidence. On December 17, 2023, Illumina then announced it would divest GRAIL.

110. As a result of defending itself against the FTC's challenges, and unsuccessfully challenging the FTC's order through the Fifth Circuit, the Individual Defendants have caused additional harm to the Company.

**Icahn Action**

---

[16] FTC, *FTC Challenges Illumina's Proposed Acquisition of Cancer Detection Test Maker Grail* (Mar. 30, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/03/ftc-challenges-illuminas-proposed-acquisition-cancer-detection-test-maker-grail (Last accessed Mar. 8, 2024).

[17] FTC, *FTC Orders Illumina to Divest Cancer Detection Test Maker GRAIL to Protect Competition in Life-Saving Technology Market* (Apr. 3, 2023) https://www.ftc.gov/news-events/news/press-releases/2023/04/ftc-orders-illumina-divest-cancer-detection-test-maker-grail-protect-competition-life-saving (Last accessed Mar. 8, 2024).

111.   On October 17, 2023, Icahn, through his partners, filed the Icahn Action against Illumina and Defendants deSouza, Thompson, Arnold, Dorsa, Epstein, Gottlieb, Guthart, Schiller, and Sigel. The Ichan Action Alleged that Illumina's acquisition of GRAIL was wrongful and that the "[d]efendants have entrenched themselves on the Board wrongfully – and orchestrated Illumina's widely-reported 'crusade' and 'obsessive quest' to complete Illumina's acquisition of GRAIL."

112.   As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's former officers.  The Company will continue to incur significant sums in relation to the Icahn Action and any liability or settlement that results.

**Additional Damage to the Company**

113.   In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

114.   The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

115.   The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward.

## CORPORATE GOVERNANCE

116.   At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members.  Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

117.   Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

**Code of Conduct**

118.   At all relevant times, the Company had in place its Code of Conduct which "applies to all of [the Company's] employees, consultants, temporary workers, officers, and members of the Board of directors." The Code of Conduct provides that it "is intended to promote honest and ethical conduct, compliance with applicable laws and regulations, and to ensure the protection of our business interests, including corporate assets and information."

119.   In a section entitled "General Principles to Follow," the Code of Conduct states:

> Always follow these principles to make sure you are helping the company maintain the highest ethical standards:
>
> • Comply fully with all applicable laws. When in doubt about the legality of an action, seek advice prior to proceeding.
>
> • Know the information contained in this Code. You are expected to comply with this Code, and all policies and procedures that apply to your job responsibilities.
>
> • Promptly complete all training activities assigned to you.
>
> • Immediately report any concerns regarding possible violations of law, regulations, company policy, or this Code to your supervisor, human resources, or the legal department at compliance@illumina.com. Concerns may also be anonymously reported through the Compliance

& Fraud Prevention Hotline on the Internet through the anonymous hotline link found on the Insider Corporate Compliance Homepage. This website offers global toll-free phone numbers where concerns may be reported.

• Always cooperate and tell the complete truth when responding to an investigation or audit. Never alter or destroy records ever in response to an investigation or when an investigation is anticipated.

120.   In a section entitled, "Compliance with the Law," the Code of Conduct states:

You are required to follow high ethical standards and comply fully with both the spirit and the letter of all applicable laws and regulations. In particular, you must observe these standards when addressing the special requirements often associated with government transactions or when dealing with government officials, representatives, or agencies that regulate the markets in which we do business. Whenever a law or regulation is unclear or seems to conflict with either another law or any provision of this Code or other Company policy or procedure, you should seek clarification from your supervisor. If your supervisor is unable to assist, you should seek clarification from the Legal department.

121.   With respect to "Public Reporting," the Code of Conduct states:

Accurate information is essential to the Company so that we can make good business decisions, and externally so that customers, investors, and the government can accurately assess the Company. This is why we require that all of the Company's books and records be fair, accurate, timely, complete, and understandable.

This requires that we maintain the integrity of our accounting and internal control system, that all transactions are valid, accurate, complete and supportable, and that they are promptly recorded in the Company's books. Our reports and documents filed with or submitted

to the Securities and Exchange Commission and the Company's other public communications, shall include full, fair, accurate, timely, and understandable disclosure. All personnel are responsible for using their best efforts to ensure that the Company meets these requirements.

**Our Responsibilities**

• Always be truthful in making any records or reports for the Company. This requires that all statements be truthful, complete, and never misleading or inappropriately suggestive.

• All records and reports of the Company must accurately reflect the truth of the underlying transaction or event. Never record false sales or shipments, understate or overstate known liabilities and assets, or defer recording items that should be expensed.

• All financial records must conform both to generally accepted accounting principles and to the Company's systems of internal controls.

• Implement appropriate internal controls, including proper segregation of job duties, monitoring of business processes for unusual items or activities, and limiting and controlling access to Company resources.

• Report known or suspected fraudulent, illegal, or unethical activities, including for example, misapplication or theft of funds, impropriety with respect to reporting financial transactions, forgery or alteration of documents, misuse of Company confidential information.

• Only sign documents, including contracts, that you are authorized to sign and that you believe are accurate.

• Contact the Legal department if there is any doubt about the appropriateness of document retention or destruction of records.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

122.   In discussing "Reporting Potential Violations or Concerns," the Code of Conduct states:

> Everyone is responsible for promptly reporting any violations of applicable law or regulations, this Code, as well as of any Company policies and procedures. Generally speaking, every effort will be made to maintain the confidentiality of reports about potential violations; however, depending on the circumstances, it may not be possible in all cases to protect the identity of the person making the report.

**Audit Committee Charter**

123.   At all relevant times, the Company had in place its Audit Committee Charter which sets forth additional duties and responsibilities for the members of the Audit Committee – consisting of Defendants Dorsa, Guthart, and Ullem.  The Audit Committee Charter provides that the Audit Committee be to monitor and advise the Board on: (i) the integrity of the Company's financial statements and disclosures; (ii) the Company's independent registered public accounting firm's qualifications, independence, and performance; (iii) the performance of the Company's internal audit function; (iv) the adequacy and effectiveness of the Company's internal controls; (v) the Company's compliance with legal and regulatory requirements; and (vi) the processes utilized by management for identifying, evaluating, and mitigating strategic, financial, operational, regulatory, compliance, litigation, information security, and external risks inherent in the Company's business.

124.   The Audit Committee Charter also sets forth these specific duties, in relevant part:

> [] Review with management and the Company's independent registered public accounting firm the annual audited financial statements, including disclosures made in management's discussion and analysis, and recommend to the Board whether the audited financial statements should be included in the Company's Annual Report on Form 10-K.

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

43

[] Review with management and the Company's independent registered public accounting firm the quarterly reports of the Company prior to filing of such reports with the SEC, including the results of the independent registered public accounting firm's review of the quarterly financial statements.

[] Review with management and the Company's independent registered public accounting firm the Company's earnings press releases as well as financial information and earnings guidance provided to analysts, including the use of "pro forma" or "adjusted" non-GAAP information and its reconciliation to GAAP.

[] Review with management any significant changes to GAAP, SEC, and other accounting standards that will impact or could impact the financial reports under review.

[] Review with management and the Company's independent registered public accounting firm significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements.

[] Review with management all material off-balance sheet transactions, arrangements, obligations (including contingent obligations) and other relationships of the Company with unconsolidated entities or other persons that may have a material current or future effect on the Company's financial condition, results of operations, liquidity, capital resources, capital reserves or significant components of revenues or expenses.

[] Review with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including review and approval of swap transactions (which may include the review and amendment of policies with regard

to the investment of the Company's assets or foreign exchange risk
management).

[] Oversee the adequacy of the Company's system of internal controls
and review with management, the internal audit department, and the
Company's independent registered public accounting firm the
adequacy and effectiveness of the Company's internal controls,
including any significant deficiencies or material weaknesses in the
design or operation of, and any material changes in, the Company's
internal controls and any special audit steps adopted in light of any
material control deficiencies, and any fraud involving management or
other employees with a significant role in such internal controls.
Review and discuss with management and the Company's independent
registered public accounting firm disclosure relating to the Company's
internal controls, the independent registered public accounting firm's
report on the effectiveness of the Company's internal control over
financial reporting, and the required management certifications to be
included in or attached as exhibits to the Company's annual report on
Form 10-K or quarterly report on Form 10-Q, as applicable.

[] Establish procedures for the receipt, retention, and treatment of
complaints received by the Company regarding accounting, internal
controls, or auditing matters.

[] Oversee the Company's compliance with SEC requirements for
disclosure of accountant's services and Audit Committee members and
activities.

[] Oversee and approve material amendments to the Company's Insider
Trading Compliance Program, Insider Trading Policy, and the Charter
of the Company's Compliance Committee.

[] Review and take appropriate action with respect to any reports to the
Audit Committee from legal counsel for the Company concerning any
material violation of securities laws or breach of fiduciary duty or

similar violation by the Company, its subsidiaries, or any person acting on their behalf.

[] Periodically review and evaluate the processes utilized by management to identify and assign relative weights to Risks.

[] Assess the adequacy of management's Risk assessment and mitigation processes, including with respect to insurance coverage and programs.

[] Review and assess the risk of fraud and the Company's antifraud programs and controls.

## **DUTIES OF THE DIRECTOR DEFENDANTS**

125.   As members of The Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

126.   The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

127.   By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

128.   Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

129.   To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)   ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b)   conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)   properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)   remain informed as to how the Company conducted its

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)    ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

130.   Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

131.   The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

132.   Plaintiff brings this action derivatively in the right and for the benefit

of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, and other wrongful conduct as alleged herein.

133.   Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

134.   Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

135.   Because of the facts set forth herein, Plaintiff has not made a demand on the Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

136.   At the time this suit was filed, the Board was comprised of eleven (11) members – the Director Defendants, as defined *supra*, along with Non-Parties MacMillan and Thaysen (collectively the "Current Directors").  Thus, Plaintiff is required to show that a majority of the Current Directors, *i.e.,* six (6), cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

137.   Notably, seven (7) of the eleven (11) Current Directors (Defendants Arnold, Dorsa, Epstein, Gottlieb, Guthart, Schiller, and Siegel) are conflicted and thus incapable of objectively considering a demand to sue the Individual Defendants (including themselves) because of their active roles in pursuing and completing the GRAIL acquisition, in the face of regulatory disapproval, to the detriment of the

Company, in breach of their fiduciary duties. Each of these seven (7) directors face a substantial likelihood of liability for the role they played and, thus, demand is futile as to each of them.

138.   The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

139.   The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

140.   Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein, and are therefore not disinterested parties.

141.   Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

142.   Additionally, each of the Current Directors received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

## THE DIRECTOR DEFENDANTS ARE
## NOT INDEPENDENT OR DISINTERESTED

**Defendant Arnold**

143.   Defendant Arnold has served as a Company director at all relevant times hereto. As a director, Defendant Arnold was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Arnold failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

144.   As a trusted Company director, Defendant Arnold conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

145.   Further, Defendant Arnold was on the Board at the time the Company entered into the agreement to acquire GRAIL on September 21, 2020 and is named as a defendant in the Icahn Action. As such, Defendant Arnold is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because she faces a substantial likelihood of liability for the misconduct alleged herein.

146.   Additionally, in connection with her role as a Company director, Defendant Arnold receives substantial income, having received $400,078 for 2022. Accordingly, Defendant Arnold cannot reasonably and objectively consider a

demand to sue the Board who control her continued compensation, including herself.

147.   Moreover, Defendant Arnold signed and therefore personally made the false and misleading statements contained in the 2023 10-K and faces a substantial likelihood of liability therefor.

148.   Defendant Arnold is neither independent nor disinterested. Any demand upon Defendant Arnold is futile and, thus, excused.

**Defendant Dorsa**

149.   Defendant Dorsa has served as a Company director at all relevant times hereto. As a director, Defendant Dorsa was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Dorsa failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

150.   As a trusted Company director, Defendant Dorsa conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

151.   Additionally, in connection with her role as a Company director, Defendant Dorsa receives substantial income, having received $415,078 for 2022. Accordingly, Defendant Dorsa cannot reasonably and objectively consider a demand to sue the Board who control her continued compensation, including herself.

152.   Further, Defendant Dorsa was on the Board at the time the Company

entered into the agreement to acquire GRAIL on September 21, 2020 and is named as a defendant in the Icahn Action. As such, Defendant Dorsa is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because she faces a substantial likelihood of liability for the misconduct alleged herein.

153.    Defendant Dorsa also serves as Chair of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Dorsa is required to oversee, *inter alia*: (i) the integrity of the Company's financial statements and disclosures; (ii) the Company's independent registered public accounting firm's qualifications, independence, and performance; (iii) the performance of the Company's internal audit function; (iv) the adequacy and effectiveness of the Company's internal controls; (v) the Company's compliance with legal and regulatory requirements; and (vi) the processes utilized by management for identifying, evaluating, and mitigating strategic, financial, operational, regulatory, compliance, litigation, information security, and external risks inherent in the Company's business. Despite this, Defendant Dorsa failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Dorsa faces a substantial likelihood of liability for her breach of fiduciary duties and any demand upon her is futile.

154.    Defendant Dorsa was a member of the Compensation Committee during the Relevant Period and had additional duties regarding, among other things, executive compensation. In Q1 2022, after the GRAIL acquisition, the Compensation Committee granted Defendant deSouza a special grant of stock options to "help ensure" his "retention and focus on innovation and increasing shareholder value." This special grant contributed to the $25 million in long-term equity compensation that Defendant deSouza received from the Company in 2022, despite his continuous breaches of fiduciary duty and wrongful conduct alleged

herein. Thus, Defendant Dorsa rewarded Defendant deSouza's illegal conduct and unjustly compensated him for causing harm to the Company, in breach of her duties to the Company. Accordingly, Defendant Dorsa lacks any objective judgment and faces a likelihood of liability for breaching her duties to the Company.

155.   Moreover, Defendant Dorsa signed and therefore personally made the false and misleading statements contained in the 2023 10-K and faces a substantial likelihood of liability therefor.

156.   Defendant Dorsa is neither independent nor disinterested. Any demand upon Defendant Dorsa is futile and, thus, excused.

**Defendant Epstein**

157.   Defendant Epstein has served as a Company director at all relevant times hereto. As a director, Defendant Epstein was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Epstein failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

158.   As a trusted Company director, Defendant Epstein conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

159.   Further, Defendant Epstein was on the Board at the time the Company entered into the agreement to acquire GRAIL on September 21, 2020 and is named

as a defendant in the Icahn Action. As such, Defendant Epstein is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because he faces a substantial likelihood of liability for the misconduct alleged herein.

160.   Additionally, in connection with his role as a Company director, Defendant Epstein receives substantial income, having received $405,078 for 2022. Accordingly, Defendant Epstein cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

161.   Defendant Epstein was a member of the Compensation Committee during the Relevant Period and had additional duties regarding, among other things, executive compensation. In Q1 2022, after the GRAIL acquisition, the Compensation Committee granted Defendant deSouza a special grant of stock options to "help ensure" his "retention and focus on innovation and increasing shareholder value." This special grant contributed to the $25 million in long-term equity compensation that Defendant deSouza received from the Company in 2022, despite his continuous breaches of fiduciary duty and wrongful conduct alleged herein. Thus, Defendant Epstein rewarded Defendant deSouza's illegal conduct and unjustly compensated him for causing harm to the Company, in breach of her duties to the Company. Accordingly, Defendant Epstein lacks any objective judgment and faces a likelihood of liability for breaching his duties to the Company.

162.   Moreover, Defendant Epstein signed and therefore personally made the false and misleading statements contained in the 2023 10-K and faces a substantial likelihood of liability therefor.

163.   Defendant Epstein is neither independent nor disinterested. Any demand upon Defendant Epstein is futile and, thus, excused.

**Defendant Gottlieb**

164.    Defendant Gottlieb has served as a Company director at all relevant times hereto. As a director, Defendant Gottlieb was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Gottlieb failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

165.    As a trusted Company director, Defendant Gottlieb conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

166.    Further, Defendant Gottlieb was on the Board at the time the Company entered into the agreement to acquire GRAIL on September 21, 2020 and is named as a defendant in the Icahn Action. As such, Defendant Gottlieb is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because he faces a substantial likelihood of liability for the misconduct alleged herein.

167.    Additionally, in connection with his role as a Company director, Defendant Gottlieb receives substantial income, having received $385,078 for 2022. Accordingly, Defendant Gottlieb cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

168.    Moreover, Defendant Gottlieb signed and therefore personally made

the false and misleading statements contained in the 2023 10-K and faces a substantial likelihood of liability therefor.

169.   Defendant Gottlieb is neither independent nor disinterested. Any demand upon Defendant Gottlieb is futile and, thus, excused.

**Defendant Guthart**

170.   Defendant Guthart has served as a Company director at all relevant times hereto. As a director, Defendant Guthart was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Guthart failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

171.   As a trusted Company director, Defendant Guthart conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

172.   Additionally, in connection with his role as a Company director, Defendant Guthart receives substantial income, having received $410,078 for 2022. Accordingly, Defendant Guthart cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

173.   Further, Defendant Guthart was on the Board at the time the Company entered into the agreement to acquire GRAIL on September 21, 2020 and is named

as a defendant in the Icahn Action. As such, Defendant Guthart is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because he faces a substantial likelihood of liability for the misconduct alleged herein.

174.   Defendant Guthart also serves as a member of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Guthart is required to oversee, *inter alia*: (i) the integrity of the Company's financial statements and disclosures; (ii) the Company's independent registered public accounting firm's qualifications, independence, and performance; (iii) the performance of the Company's internal audit function; (iv) the adequacy and effectiveness of the Company's internal controls; (v) the Company's compliance with legal and regulatory requirements; and (vi) the processes utilized by management for identifying, evaluating, and mitigating strategic, financial, operational, regulatory, compliance, litigation, information security, and external risks inherent in the Company's business. Despite this, Defendant Guthart failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Guthart faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

175.   Defendant Guthart was a member of the Compensation Committee during the Relevant Period and had additional duties regarding, among other things, executive compensation. In Q1 2022, after the GRAIL acquisition, the Compensation Committee granted Defendant deSouza a special grant of stock options to "help ensure" his "retention and focus on innovation and increasing shareholder value." This special grant contributed to the $25 million in long-term equity compensation that Defendant deSouza received from the Company in 2022, despite his continuous breaches of fiduciary duty and wrongful conduct alleged herein. Thus, Defendant Guthart rewarded Defendant deSouza's illegal conduct and

unjustly compensated him for causing harm to the Company, in breach of her duties to the Company. Accordingly, Defendant Guthart lacks any objective judgment and faces a likelihood of liability for breaching his duties to the Company.

176.   Moreover, Defendant Guthart signed and therefore personally made the false and misleading statements contained in the 2023 10-K and faces a substantial likelihood of liability therefor.

177.   Defendant Guthart is neither independent nor disinterested. Any demand upon Defendant Guthart is futile and, thus, excused.

**Defendant Schiller**

178.   Defendant Schiller has served as a Company director at all relevant times hereto. As a director, Defendant Schiller was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Schiller failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

179.   As a trusted Company director, Defendant Schiller conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

180.   Further, Defendant Schiller was on the Board at the time the Company entered into the agreement to acquire GRAIL on September 21, 2020 and is named as a defendant in the Icahn Action. As such, Defendant Schiller is incapable of

making an independent and disinterested decision to institute and vigorously prosecute this action because he faces a substantial likelihood of liability for the misconduct alleged herein.

181. Additionally, in connection with his role as a Company director, Defendant Schiller receives substantial income, having received $395,078 for 2022. Accordingly, Defendant Schiller cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

182. Moreover, Defendant Schiller signed and therefore personally made the false and misleading statements contained in the 2023 10-K and faces a substantial likelihood of liability therefor.

183. Defendant Schiller is neither independent nor disinterested. Any demand upon Defendant Schiller is futile and, thus, excused.

**Defendant Siegel**

184. Defendant Siegel has served as a Company director at all relevant times hereto. As a director, Defendant Siegel was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Siegel failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

185. As a trusted Company director, Defendant Siegel conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over

reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

186.   Further, Defendant Siegel was on the Board at the time the Company entered into the agreement to acquire GRAIL on September 21, 2020 and is named as a defendant in the Icahn Action. As such, Defendant Siegel is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because she faces a substantial likelihood of liability for the misconduct alleged herein.

187.   Additionally, in connection with her role as a Company director, Defendant Siegel receives substantial income, having received $390,078 for 2022. Accordingly, Defendant Siegel cannot reasonably and objectively consider a demand to sue the Board who control her continued compensation, including herself.

188.   Moreover, Defendant Siegel signed and therefore personally made the false and misleading statements contained in the 2023 10-K and faces a substantial likelihood of liability therefor.

189.   Defendant Siegel is neither independent nor disinterested. Any demand upon Defendant Siegel is futile and, thus, excused.

**Defendant Teno**

190.   Defendant Teno has served as a Company director at all relevant times hereto. As a director, Defendant Teno was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Teno failed to fulfil these duties by permitting the false and misleading statements

to be made and not correcting those statements.

191.   As a trusted Company director, Defendant Teno conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

192.   Additionally, in connection with his role as a Company director, Defendant Teno receives substantial income. Accordingly, Defendant Teno cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

193.   Defendant Teno is neither independent nor disinterested. Any demand upon Defendant Teno is futile and, thus, excused.

**Defendant Ullem**

194.   Defendant Ullem has served as a Company director at all relevant times hereto. As a director, Defendant Ullem was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Ullem failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

195.   As a trusted Company director, Defendant Ullem conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to

1    protect corporate assets.

2        196.   Additionally, in connection with his role as a Company director,

3    Defendant Ullem receives substantial income. Accordingly, Defendant Ullem

4    cannot reasonably and objectively consider a demand to sue the Board who control

5    his continued compensation, including himself.

6        197.   Defendant Ullem also serves as a member of the Audit Committee and

7    holds additional duties by virtue thereof. In particular, Defendant Ullem is required

8    to oversee, *inter alia*: (i) the integrity of the Company's financial statements and

9    disclosures; (ii) the Company's independent registered public accounting firm's

10   qualifications, independence, and performance; (iii) the performance of the

11   Company's internal audit function; (iv) the adequacy and effectiveness of the

12   Company's internal controls; (v) the Company's compliance with legal and

13   regulatory requirements; and (vi) the processes utilized by management for

14   identifying, evaluating, and mitigating strategic, financial, operational, regulatory,

15   compliance, litigation, information security, and external risks inherent in the

16   Company's business. Despite this, Defendant Ullem failed to fulfil these additional

17   duties by allowing the false and misleading statements to be made and also by not

18   correcting them. Therefore, Defendant Ullem faces a substantial likelihood of

19   liability for his breach of fiduciary duties and any demand upon him is futile.

20       198.   Defendant Ullem is neither independent nor disinterested. Any demand

21   upon Defendant Ullem is futile and, thus, excused.

22   **Non-Party Thaysen**

23       199.   Non-Party Thaysen is neither disinterested nor independent, and

24   therefore, is incapable of considering demand because he (as its president and CEO)

25   is an employee of the Company who derives substantially all of his income from his

26   employment with Advance Auto Parts, making him not independent. As such, Non-

27   Party Thaysen cannot independently consider any demand to sue himself for

28

breaching his fiduciary duties to Advance Auto Parts, because that would expose him to liability and threaten his livelihood.

200.   As CEO, Non-Party Thaysen also fails the Nasdaq's bright-line independence test and cannot, therefore, be considered independent, as admitted by the Company on its Investor Relations website. As such, Non-Party Thaysen could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Non-Party Thaysen is therefore futile.

201.   Additionally, in connection with his role as a Company director, Defendant Thaysen receives substantial income. Non-Party Thaysen is not independent from Defendants Epstein, Gottlieb, Siegel, and Teno as they comprise the Compensation Committee and are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Non-Party Thaysen. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers.   Because of his status as an inside director, and the concomitant substantial compensation he receives, Non-Party Thaysen could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

202.   Non-Party Thaysen is neither independent nor disinterested. Any demand upon Non-Party Thaysen is futile and, thus, excused.

**Demand is also Futile**

**Due to Director Entrenchment[18]**

203.   During the Relevant Period, Defendants Arnold, Dorsa, Epstein, Gottlieb, Guthart, Schiller, and Siegel ("Conflicted Directors") sought to entrench

---

[18] Allegations made as to director entrenchment are taken from the Icahn Action and are based upon information and belief.

themselves as directors to assert complete control over Illumina's strategy and disclosures regarding GRAIL and the acquisition.

204.  In January 2023, Illumina renewed a $750 loan from Bank of America which included a "Change in Control" provision which triggers an event of default if the board is removed or replaced in any two-year period without approval of the incumbent Board. Such a provision is often recognized as an entrenchment device due to its effect on proxy challenges. The loan was disclosed on January 4, 2023 via an 8-K filing with the SEC, but the Change of Control provision is buried in the 156-page agreement without comment.

205.  Further, from March 2023 through May 2023, certain of the Individual Defendants issued a series of false and misleading statements in twenty-three (23) SEC filings (the "2023 Proxy Filings") in an attempt to secure re-election to the Board.

206.  On April 20, 2023, five weeks before the 2023 shareholder vote, certain of the Individual Defendants pre-emptively announced their intention to propose the addition of two (2) new directors to the Board at some point in the future. Then, on June 1, 2023, after Defendant Thompson was voted off the Board, certain of the Individual Defendants voted to increase the size of the Board from nine (9) to eleven (11) members and elected Defendant Ullem and Non-Party MacMillan.

207.  Further, following the announcement of the GRAIL acquisition, certain of the Individual Defendants touted the "compelling" reasons to re-unite GRAIL and Illumina, describing the closing as a "moral obligation." For example, in an August 18, 2021 press release approved by one or more of the Individual Defendants, Illumina claimed that "The deal will save lives." Yet, despite acknowledging the EC investigation," the press release failed to disclose material information. Moreover, on May 12, 2023, a supplement to the Company's proxy was issued which asserted that certain of the Individual Defendants had engaged in "a rigorous, comprehensive

process in deciding to close the acquisition of GRAIL," that the "process was informed by external experts," and that their "decisions were informed by legal and regulatory external advice from EU, U.S., and UK counsel."

208.   These statements and actions, made and/or approved by the Conflicted Directors (as well as certain other Individual Defendants), aggressively touted the benefits of the GRAIL acquisition while failing to disclose certain material information to shareholders and the investing public in an effort to improperly close the GRAIL acquisition and entrench themselves in the Company, with complete disregard for the well-being of Illumina.

209.   Furthermore, upon information and belief, the Conflicted Directors may have indirectly benefitted financially from the GRAIL acquisition. In such event, which at this time is only known to the Conflicted Defendants, each of the Conflicted Defendants would face a substantial likelihood of liability and could not objectively consider a demand to prosecute this action.[19]

210.   As such, the Conflicted Directors each face a substantial likelihood of liability and are, in any event, incapable of independently and disinterestedly considering a demand in this Action, or pursuing the claims alleged herein on behalf of the Company, and demand is futile as to each of them.

**Additional Reasons Demand is Futile**

211.   The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Current Directors have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

212.   The Company, at all material times, had its Code of Conduct, Business

---

[19] *See Icahn Partners LP, et al. v. deSouza, et al.*, C.A. No. 2023-1045-PAF (Del. Ch.) (Compl., at ¶ 91).

Code, and related corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite this Code of Conduct and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

213.   In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

214.   The Current Directors received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board.  They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

215.   The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of

the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Current Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

216. Publicly traded companies, such as Illumina, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Current Directors will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event.

217. Accordingly, each of the Current Directors, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Current Directors is futile and, thus, excused.

## CLAIMS FOR RELIEF

## COUNT I

### (Against the Individual Defendants for Breach of Fiduciary Duties)

218. Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

219. The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

220.   The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

221.   The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.   Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials.   These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

222.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

223.   As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.   Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## COUNT II

### (Against the Individual Defendants for Gross Mismanagement)

224.   Plaintiff incorporates by reference and re-allege each allegation contained above, as though fully set forth herein.

225.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

226.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

227.   Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

### COUNT III

### (Against the Individual Defendants for Waste of Corporate Assets)

228.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

229.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

230.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

231.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

### COUNT IV

### (Against the Individual Defendants for Unjust Enrichment)

232.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

233.   By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be

made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

234.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

235.   Plaintiff, as a shareholder and representative of the Company seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## COUNT V

### (Against the Director Defendants for Aiding and Abetting)

236.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

237.   The Director Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Individual Defendants.

238.   Specifically, the Director Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Company to engage in the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Individual Defendants' violations of law as alleged herein, and failing to report the same.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

239.   As a result, the Director Defendants substantially assisted the Individual Defendants in breaching their fiduciary duties and in committing the other wrongful and unlawful conduct as alleged herein.

240.   As a direct and proximate result of the aiding and abetting the breaches of fiduciary duty alleged herein, the Company has sustained and will continue to sustain significant damages.

241.   As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

## COUNT VI

### (Against Defendants deSouza and Thompson for Contribution Under Sections 10(b) and 21D of the Securities Exchange Act of 1934)

242.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

243.   Illumina, along with the Defendants deSouza and Thompson ("Officer Defendants"), are named as defendants in the Icahn Action, Kangas Action, LSPRF Action, and Roy Action (together, the "Securities Class Actions"), which assert, *inter alia*, claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

244.   The Securities Class Actions allege that the class members relied, directly or indirectly, upon the false and misleading statements and omissions, as alleged herein, in purchasing Illumina securities. The Securities Class Actions further allege that, as a direct and proximate result, the class members suffered damages because the value of their investments were artificially inflated by the false and misleading statements and omissions, they purchased such securities at the artificially inflated prices, and the value of their investments fell when the truth was eventually revealed, causing economic losses to the class members.

245.   If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Officer Defendants' willful and/or reckless violations of their obligations as officers and/or directors of the Company.

246.   The Officer Defendants, because of their positions of control and authority as senior executive officers of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Actions.

247.   Accordingly, the Officer Defendants are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

248.   As such, the Company is entitled to receive all appropriate contribution or indemnification from the Officer Defendants.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A.      Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.      Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.      Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' unjust enrichment;

D.      Awarding, against the Director Defendants and in favor of the Company, damages sustained by the Company as a result of the Director

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Defendants' aiding and abetting of the Individual Defendants' breaches of fiduciary duty;

E.      Awarding, against the Officer Defendants and in favor of the Company, all contribution and indemnification under Sections 10(b) and 21D of the Securities Exchange Act of 1934;

F.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

G.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: March 8, 2024

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By: *&#47;s&#47; Betsy C. Manifold*

BETSY C. MANIFOLD (182450)
ALEX J. TRAMONTANO (276666)
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
Email: manifold@whafh.com

Gregory M. Egleston
**GAINEY McKENNA & EGLESTON**
501 Fifth Avenue, 19th Fl.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

74

New York, NY 10017
Tel:    (212) 983-1300
Fax:    (212) 983-0383
Email: gegleston@gme-law.com

***Attorneys for Plaintiff***

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## **VERIFICATION**

I, MICHAEL WARNER, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Illumina, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do no have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Illumina, Inc. common stock at all relevant times.

MICHAEL WARNER